[Cite as *In re A.H.*, 2024-Ohio-5485.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE  A.H.,                                           :

                                                                          No. 113846
A Minor Child                                    :

[Appeal by CCDCFS]                        :

JOURNAL ENTRY AND OPINION

**JUDGMENT:**  AFFIRMED
**RELEASED AND JOURNALIZED:**  November 21, 2024

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD-23-909131

***Appearances:***

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Anthony R. Beery, Assistant Prosecuting
Attorney, *for appellee.*

Gregory T. Stralka, *for appellee.*

MICHELLE J. SHEEHAN, P.J.:

{¶ 1} Appellant, Cuyahoga County Department of Children and Family
Services ("CCDCFS" or "agency"), appeals the juvenile court's judgment denying its
request for permanent custody of A.H., a minor child born in April 2021, and

granting legal custody to D.H. ("father") with protective supervision to CCDCFS. CCDCFS raises two assignments of error for our review:

> 1. The trial court's decision to grant legal custody of A.H. to appellee instead of permanent custody to CCDCFS, or in the alternative temporary custody to CCDCFS, was against the manifest weight of the evidence and not in the child's best interest.
>
> 2. The trial court erred in excluding relevant information relating to appellee's long-standing mental health issues.

{¶ 2} After review, we conclude that the juvenile court's decision granting legal custody of A.H. to father with protective supervision to CCDCFS was not against the manifest weight of the evidence. We further conclude that the juvenile court did not abuse its discretion when it limited some of the testimony of CCDCFS's witnesses regarding father's history of "problematic behaviors." And even if we agreed with CCDCFS that the juvenile court abused its discretion when it limited some of this evidence, any error was harmless. We therefore overrule CCDCFS's assigned errors and affirm the juvenile court's judgment.

## I. Procedural History and Factual Background

{¶ 3} In August 2023, CCDCFS obtained emergency temporary custody of A.H. after filing a complaint in the juvenile court alleging, inter alia, that (1) father had a mental-health crisis on August 9, 2023, resulting in father's hospitalization, (2) father left A.H. home alone for an extended period, and (3) father could not provide for A.H. CCDCFS further alleged in its complaint that A.H. was a neglected and dependent child and requested permanent custody of him pursuant to R.C. 2151.353(A)(4).

**{¶ 4}** Father stipulated to an amended complaint, and the juvenile court adjudicated the child dependent. The matter proceeded to a dispositional hearing that took place over two days in January and April 2024. Father appeared for both hearings, but mother appeared only for the first hearing. Mother's counsel, however, informed the court that it was mother's position that the court should grant legal custody to father.[1]

**A. Dispositional Hearing**

**{¶ 5}** CCDCFS entered a video into evidence of a police officer's body camera that recorded the incident that occurred on August 9, 2023, that led to A.H.'s removal. In the recording, father was sitting on the floor of what looked like a hallway of an apartment building. Father's hand was wrapped in a towel, and he told the officers that he had punched his hand through a window in his apartment. It sounds as if father tells the officers, "We have been hungry for a lot of weeks," but then he told them that his son had just eaten 20 minutes before the officers had gotten there. Father also told the officers that he left his son alone, that it was not safe, and that he did not have anyone to babysit his son. Father was admitted to the hospital after this incident.

**{¶ 6}** While in the hospital, father assaulted another patient. CCDCFS entered a judgment entry into evidence from Lorain Municipal Court showing that

---

[1] Mother currently lives in a rehabilitation home and has not consistently been involved with A.H.

father had been convicted of assault on September 1, 2023. He was sentenced to 30 days in jail but was only required to serve 15 days of that sentence.

{¶ 7} CCDCFS presented three witnesses from FrontLine Service ("FrontLine"), an organization where father had received mental-health treatment and other services for many years, and a social worker from CCDCFS. Father presented one witness who was his peer support representative at FrontLine. CCDCFS submitted 2,000 pages of electronic records from FrontLine that were admitted into evidence. As the FrontLine witnesses testified, they identified and testified to notes that they or someone they supervised had documented when working with father.

**Case Manager at FrontLine**

{¶ 8} Tamara Wagner testified that she worked as a case manager at FrontLine for approximately one year in 2019. She was father's case manager for three or four months. She assisted father with transportation to appointments, reinstating his social security benefits, obtaining housing, and other services.

{¶ 9} Wagner testified that she began working with father after he had just gotten out of jail in February 2019. She said that father was stable at that time and "[i]f you didn't know him, you wouldn't know that he had mental health issues." But Wagner said that if father was not compliant with his medication, he was "challenging."

{¶ 10} Wagner described an incident that occurred approximately one month after she began working with father. She was helping father obtain food

stamps at the Ohio Department of Jobs and Family Services ("JFS"). She believed that at that time, father was either noncompliant with his medication or was under the influence of something. According to Wagner, father became angry, upset, and impatient because it was taking so long. He yelled at people to "[m]ove the F out of the way" and said, "I ain't got time for this s[***]." He yelled at people who were looking at him. He told an elderly woman that she could not sit at a table because there was not enough room when there were empty chairs. He called a disabled JFS employee a "cripple" and cursed at and threatened her, stating, "You got me F'd up and I know y'all talking about me. I'll shoot all y'all ears up in here because y'all keep F'ing with me." Wagner stated that people were afraid of father and security escorted him out of the building. After that incident, Wagner's supervisor advised her not to be alone with father when she worked with him.

**Nurse Practitioner at FrontLine**

{¶ 11} Maura Fibbi, a board-certified nurse practitioner at FrontLine, testified that she diagnosed clients' mental illnesses and managed their medications. Father had been her client for approximately two-and-a-half years. Fibbi said that father had been diagnosed with schizoaffective disorder, bipolar type. She explained that father obtains an injection containing his medication every three or six months, depending on the type of medication that is available. She said that father consistently requests the six-month version, but it is not always available in FrontLine's pharmacy. She agreed that the longer-lasting medication was better to ensure that father remained compliant.

{¶ 12} Fibbi testified that when father is getting close to receiving his next injection of medication, he becomes irritable. She said that father missed an injection of medication in January 2022 and was a week late getting his injection in July 2022. After each of those times, she did not see "overt signs or symptoms of psychosis." Father received the six-month dose of his medication in February 2023 and, therefore, was scheduled to receive it again in August 2023. Father did not receive his injection in August 2023, however, because his insurance had not approved it.

{¶ 13} Fibbi testified that she gave father a six-month dose of his medication on September 11, 2023, which was one month late. Father was irritable at that time but "under behavioral control" and cooperative, and there were no identifiable signs of imminent risk of violence. Father was also "demonstrating insight into symptoms" and "requesting medications by name."

{¶ 14} Fibbi met with father a week later. He demonstrated "symptom improvement" since he had received the medication. He was still mildly irritable but also still under behavioral control and cooperative.

{¶ 15} Fibbi also met with father two more times in October 2023 and once in November 2023. Father continued to improve each time. By early October, father was no longer irritable. In late October, father was "euthymic and engaged" and his symptoms had improved significantly. By late November, father did not have any "overt signs of psychosis or mood episode," his symptoms appeared to be "well managed," and he was demonstrating "good insight into [his] diagnosis."

{¶ 16} Fibbi agreed on cross-examination that during the time she had been treating father, he did not show signs or symptoms of psychosis and did not pose a safety concern.

**Supervisor at FrontLine**

{¶ 17} Diane Warman, associate director of case management at FrontLine, testified that she is a licensed social worker who supervises "the direct service staff, as well as provides direct client care." She had been with FrontLine for 11 years, and of those 11 years, she had been directly involved in father's case for "the past six years or so."

{¶ 18} Warman described an incident that occurred on September 8, 2023, just after father had been released from the hospital. She said that father did not appear to be doing well and was doing push-ups in FrontLine's lobby. He was also rearranging photos in the lobby and "just had some paranoia." She noted in father's progress notes that father "presented as grandiose, paranoid, and with disorganized thoughts." She explained that he "was discussing females and how they wanted relationships with him." She asked him to leave so she could talk to him outside. He went outside and "walked in and out of traffic."

{¶ 19} Warman discussed housing services that had been provided to father. She explained that at one point, father had housing through the EDEN housing program and lived in a "permanent supportive housing building." Father lost his voucher to the EDEN housing in 2018, however, due to being incarcerated for more than 90 days. Father was kicked out of a men's shelter in January 2020.

{¶ 20} Warman said that when this case started, father was living in an apartment. He had to leave that apartment because the unit failed inspection due to the fault of the landlord. Father then applied for housing through the Cuyahoga Metropolitan Housing Association ("CMHA"). While he waited for approval, he temporarily lived in a men's shelter. Father was approved for CMHA housing in November or December 2023 and now lives in an apartment. Because he is in CMHA housing, his EDEN voucher was terminated. Warman explained that without an EDEN voucher, FrontLine can no longer provide financial assistance to father, such as purchase groceries for him, but it can and does provide other services to him. FrontLine can also refer father to other programs that can assist him with obtaining food and household items.

{¶ 21} Warman testified to many dated entries from FrontLine's electronic records where FrontLine provided father with assistance over the years, including helping him obtain baby formula and diapers, blankets, food, bus passes, and clothing. FrontLine also assisted father with obtaining food stamps and copies of A.H.'s birth certificate, as well as paying his utility bills.

{¶ 22} Warman discussed an incident that occurred in January 2020 when father met with her and appeared to be stable but sat with his back to her the entire visit. Warman discussed another incident in August 2021 when father appeared to be under the influence of something. She said that his eyes were glossy and she had to redirect his behavior because he was lifting his shirt in front of staff.

{¶ 23} Warman testified that she believed that with medication, father could function in society. She also believed that he could function in society without medication but said that he would be more likely to make impulsive decisions. She further stated that without medication, father would be more likely to have paranoid and grandiose thoughts.

{¶ 24} Warman could not recall any incident where father had been aggressive. She also could not recall an incident where other staff members noted he was aggressive.

{¶ 25} On cross-examination, Warman agreed people with father's mental-health diagnosis can successfully parent if their medications are managed. They are also able to be productive, resourceful, and function in society. Warman stated that she was confident in father's ability to seek resources when he or A.H. needed something and has "always followed through with the resources" she has provided to him.

**Peer Support Representative at FrontLine**

{¶ 26} Trenton Wallace, a peer support representative at FrontLine, testified that it is his job to advocate for father and he had been doing so for approximately one year. Wallace listens to father, determines what he needs, and coordinates resources for father, including assisting him with obtaining all the services that FrontLine provides or resources that father needs. Wallace said that father will "even go up the chain if he doesn't feel like he's being responded to as quickly or if someone is not available to him."

{¶ 27} Wallace testified that he helped father obtain diapers and food for A.H. Wallace opined that father and A.H. have "a beautiful understanding relationship." Father communicates well with A.H.; he talks to and listens to A.H. Wallace believes that father could competently care for A.H. Wallace said that whatever A.H. needs, father makes sure he has it.

{¶ 28} Wallace testified that father "was probably at his best" when he is with A.H. According to Wallace, father shows A.H. "a lot of love and care," father is patient with the toddler, and father has never been "violent or forceful" with him. Wallace did not have any concerns for A.H. being with father because father was "a loving and protective parent."

{¶ 29} Wallace agreed on cross-examination that he had observed father under the influence of a substance "a couple of times."

**Child Protective Specialist at CCDCFS**

{¶ 30} Lauren Hopkins, a child protective specialist at CCDCFS assigned to father's case, testified that CCDCFS obtained permanent custody of father's other child in 2015 because of substance abuse and mental-health issues. She said that father did not complete the requirements of his case plan in the previous case. The juvenile court's judgment entry granting CCDCFS permanent custody and the case plan from that case were entered into evidence.

{¶ 31} Hopkins stated that father's current case plan, although not yet adopted and ordered by the court, contained mental health, housing, and substance abuse components. CCDCFS had not made any referrals for father because he had

been involved with FrontLine for over ten years and wanted to remain with FrontLine.

{¶ 32} Hopkins testified that CCDCFS's main reason for seeking permanent custody in its original complaint rather than temporary custody and why it believes that father's mental health prevents him from reunifying with A.H. is because FrontLine does not have a "set plan" to prevent father from missing his medication in the future. She said that FrontLine blamed their lack of a plan on "shortness of staff or father needing to be agreeable if they were to pick him up and take him to get his injection."

{¶ 33} Hopkins reviewed many pages of the FrontLine records regarding father's past substance-abuse issues. Father admitted to FrontLine workers in 2015 that he had been using K2, which was synthetic marijuana. In September 2016, father told a FrontLine worker that he smoked marijuana every day. In January 2018, father admitted that K2 was bad for him and that he should stick to natural marijuana.

{¶ 34} Regarding his past mental-health issues, Hopkins testified to FrontLine records that showed that father was hospitalized in 2018 and lost his housing that same year due to his schizoaffective disorder. Hopkins stated that father was then hospitalized again in August 2023. Hopkins stated that the agency is concerned that father has been involved with FrontLine for so many years and still ends up being hospitalized for mental-health reasons.

{¶ 35} Hopkins explained that the agency also has concerns about father's ability to maintain housing. She said that just since this case started, father had lived in three places. She admitted on cross-examination, however, that he lost the first one through no fault of his own and that the second one was only temporary housing until he could obtain CMHA housing, which he finally did in November or December 2023.

{¶ 36} Regarding father's ability to provide for A.H.'s basic needs, Hopkins explained that father has a bed for A.H. but does not have a refrigerator or stove, although he does have a hot plate to heat food for A.H. Hopkins said that she referred father to "the Collab" to obtain appliances but they were not able to assist father. Hopkins admitted on cross-examination, however, that the reason father could not obtain appliances from the Collab was because the agency had filed for permanent custody and, therefore, father was not eligible to obtain them.

{¶ 37} Hopkins stated that the agency also had concerns that father has a "pattern of incarceration." She said that he had been incarcerated for 180 days in 2018 for attempted vandalism and for 15 days in August 2023 for assaulting another resident while in the hospital. Hopkins said that when father is incarcerated, he does not have any family members nearby to care for A.H.

{¶ 38} Hopkins testified that father had missed four visits with A.H. since the visits had begun, which was sometime in November or December 2023. He cancelled one because he did not have food for A.H. He cancelled another because he said that he did not have heat in his apartment. Hopkins said that when father

did not have heat, she offered to supervise the visit at Burger King, but father did not want to meet somewhere else. Hopkins further testified that father sometimes ends the visits early. But she stated that the visits go well, and father is appropriate with A.H. She said that A.H. is very excited to see father when they arrive. Father plays with A.H. and gives him snacks. Hopkins stated that father and A.H. "have a very good bond." A.H. does not like to leave father's home when it is time to go.

{¶ 39} Hopkins further testified that A.H. is also bonded with his foster mother and is comfortable in his foster home. There are other children in the foster home, and A.H. likes to play with them. He also does not like to leave there when she picks him up to take him to father's home.

{¶ 40} Hopkins said that the agency did not consider temporary custody in this case due to father's long-term mental-health issues "that cannot be fixed." She disagreed with father's mental-health providers that father could properly address his mental-health issues because "there has still been these incidences where he ends up in the hospital unable to care for [A.H.]." Hopkins agreed that father has never had a chance to work his case plan in this case.

**B. Guardian Ad Litem's Reports and Testimony**

{¶ 41} The guardian ad litem filed her initial report in October 2023. The guardian ad litem reported that she had visited the child in his foster home, where he was doing well. The guardian ad litem had also observed several visits between A.H. and father. The guardian ad litem stated that the child and father have a "strong bond" and the child is "happy, comfortable, and relax[ed]" when he is with

father. The guardian ad litem recommended that the juvenile court grant temporary custody of A.H. to the agency, stating that "the child's father should have the opportunity to work on a case plan."

{¶ 42} The guardian ad litem filed a supplemental report just before the second dispositional hearing in April 2024. In this report, the guardian ad litem recommended that the juvenile court deny the agency's motion for permanent custody and grant legal custody to father with protective supervision to the agency. The guardian ad litem believed it was in A.H.'s best interests to be with father.

{¶ 43} The guardian ad litem reported that she had recently visited father's home and observed father and A.H. together. The guardian ad litem reported that A.H. "seemed wonderfully comfortable in father's presence" and "seemed to enjoy the warmth, affection, and tenderness of his father." The guardian ad litem stated that father's home was clean and appropriate but that he needed to obtain more furniture, including an oven and a refrigerator. However, A.H. had his own room with a bed. Father receives social security income and food stamps.

{¶ 44} According to the guardian ad litem's supplemental report, the agency filed three previous complaints alleging that A.H. was a neglected and dependent child: in September 2022, December 2022, and March 2023. The juvenile court dismissed all three cases; one because the matter was not resolved within the 90-day statutory time limit and the other two because the agency did not prove its allegations by clear and convincing evidence.

**{¶ 45}** The guardian ad litem testified that she had been involved with father and A.H. since September 2022 because she had been involved in the previous cases. After hearing the testimony presented at the dispositional hearing, she did not hear anything that caused her to change her recommendation. She still believed that it was in the child's best interest for the agency's permanent custody motion to be denied. The guardian ad litem did not believe that the agency has made sufficient efforts to work with father. She further believed that with resources, father can provide for A.H.

**{¶ 46}** The guardian ad litem testified that during one visit, father let her walk around his apartment while he visited with A.H. She verified that father had sufficient food in his pantry for A.H. and a hot plate to heat food. And although he does not have a stove or refrigerator, he had attempted to obtain one and was denied only because the agency was seeking permanent custody.

**{¶ 47}** The guardian ad litem testified that father has a lot of patience with A.H. and tries to understand him. Father remains calm during visits when A.H. is screaming or not behaving. Based upon father's interactions with A.H., the guardian ad litem said that she does not believe that father needs more parenting classes.

**{¶ 48}** The guardian ad litem further testified that when father was hospitalized in August 2023, he called her many times to ask how A.H. was doing.

**C. Juvenile Court's Judgment**

**{¶ 49}** The juvenile court found that father had substantially remedied the conditions that caused the child to be placed outside the child's home and could

provide an adequate permanent home for the child. The court also found that father has demonstrated a commitment to the child by regularly supporting, visiting, or communicating with the child.

{¶ 50} Although the juvenile court acknowledged that father has a severe chronic mental illness, it found that father had experienced an acute episode that led to the child's removal. The court further found that since that time, father had received appropriate medical care and remained engaged in mental-health treatment and medication management. The court concluded that CCDCFS did not present sufficient evidence to establish that father's mental illness posed a direct risk to the child.

{¶ 51} The juvenile court found that permanent custody was not in the best interests of the child and that the child could be placed with father within a reasonable time and should be placed with father. The court also concluded that it was in the child's best interests to be returned to father's custody with protective supervision to CCDCFS.

{¶ 52} It is from the juvenile court's judgment that CCDCFS appeals.[2]

## II. Law and Analysis

### A. Permanent Custody

{¶ 53} The right to raise one's own child is "'an essential and basic civil right.'" *In re N.B.*, 2015-Ohio-314, ¶ 67 (8th Dist.), quoting *In re Hayes*, 79 Ohio

---

[2] CCDCFS moved for a stay of the trial court's judgment during the pendency of this appeal, which this court granted.

St.3d 46, 48 (1997). That right, however, is always subject to the ultimate welfare of the child. *In re B.C.*, 2014-Ohio-4558, ¶ 20, citing *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979).

{¶ 54} An agency may obtain permanent custody of a child in one of two ways. *In re E.P.*, 2010-Ohio-2761, ¶ 22 (12th Dist.). An agency may first obtain temporary custody of the child and then file a motion for permanent custody under R.C. 2151.413, or an agency may request permanent custody as part of its original abuse, neglect, or dependency complaint under R.C. 2151.353(A)(4).

{¶ 55} In this case, the agency moved for permanent custody in its original neglect and dependency complaint pursuant to R.C. 2151.353(A)(4). Under this provision, a juvenile court may award permanent custody of a child to a "public services agency" after the court adjudicates the child to be abused, neglected, or dependent if the court (1) "determines in accordance with [R.C. 2151.414(E)] that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent," and (2) "determines in accordance with [R.C. 2151.414(D)(1)] that the permanent commitment is in the best interest of the child." R.C. 2151.353(A)(4).

{¶ 56} The standard for reviewing permanent custody cases was set forth in *In re Z.C.*, 2023-Ohio-4703. The Supreme Court of Ohio held that sufficiency of the evidence and/or manifest weight of the evidence — and not abuse of discretion — are the proper appellate standards of review of permanent custody determinations depending on the arguments raised by the appellant. *Id.* at ¶ 11. Here, CCDCFS

argues that the juvenile court's decision denying its motion for permanent custody is against the manifest weight of the evidence.

{¶ 57} When reviewing for manifest weight in permanent custody cases, "the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *Id.* at ¶ 14. When weighing the evidence, we "must always be mindful of the presumption in favor of the finder of fact." *Id.*, quoting *Eastly v. Volkman*, 2012-Ohio-2179, ¶ 21. The Supreme Court noted in *In re Z.C.* that "although the phrase 'some competent, credible evidence' can be helpful in describing the reviewing court's deferential role in the manifest-weight analysis, it should not be used as a substitute for the separate sufficiency and manifest-weight analyses appropriate for permanent-custody determinations." *Id.* at ¶ 15, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984).

{¶ 58} When it comes to reviewing the best-interest factors, the juvenile court has considerable discretion in weighing them. *In re J.H.*, 2017-Ohio-7070, ¶ 53 (8th Dist.). The best-interest determination focuses on the child, not the parent. *In re N.B.*, 2015-Ohio-314, ¶ 59 (8th Dist.), citing *In re Mayle*, 2000 Ohio App. LEXIS 3379 (8th Dist. July 27, 2000). Although the juvenile court is required to consider each factor listed in R.C. 2151.414(D)(1), no one factor is given greater

weight than the others pursuant to the statute. *In re T.H.*, 2014-Ohio-2985, ¶ 23 (8th Dist.), citing *In re Schaefer*, 2006-Ohio-5513.

### B. R.C. 2151.414(E) Factors

{¶ 59} Before a juvenile court can commit a child to the permanent custody of a public children services agency when the agency requests permanent custody in its original complaint, R.C. 2151.353(A)(4) requires that the juvenile court must first find that one of the factors under R.C. 2151.414(E) applies. R.C. 2151.414(E) and the factors that are relevant to this case state:

> (E) In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A) (4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

> (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

> (2) Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate

permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code;

. . .

(11) The parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to this section or section 2151.353 or 2151.415 of the Revised Code, or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to those sections, and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child.

{¶ 60} CCDCFS argues that the juvenile court's finding that A.H. could be placed with father within a reasonable time or should be placed with father was against the manifest weight of the evidence because subsections (1), (2), and (11) of R.C. 2151.414(E) apply. We will discuss these factors in the order that CCDCFS argues them.

### 1. R.C. 2151.414(E)(2) — Chronic-Mental Illness

{¶ 61} CCDCFS first argues that the juvenile court's finding that there was insufficient evidence to demonstrate that father's severe mental illness "posed a direct risk to the child" was against the manifest weight of the evidence. CCDCFS maintains that "the trial record contained more than sufficient evidence" to establish that father's mental illness "was so chronic and severe that it rendered him unable to care for children at the time of trial or within one year afterward." We disagree.

{¶ 62} The juvenile court found that while father's chronic-mental illness is severe, the August 2023 incident that led to the child's removal was an acute

episode. The juvenile court further found that after the August 2023 incident, father sought and received appropriate medical care and remains engaged in mental-health treatment and medication management. Finally, the juvenile court found that father's mental illness did not pose a direct risk to A.H. The juvenile court's findings regarding father's mental health are supported by competent, credible evidence and are not against the manifest weight of the evidence.

{¶ 63} First and foremost, the juvenile court received the guardian ad litem's original and supplement reports and heard the guardian ad litem's testimony. The guardian ad litem was not only involved with father and A.H. during the pendency of this case but also three previous cases that juvenile court had dismissed. Juv.R. 4(B)(5) states that "[t]he court shall appoint a guardian ad litem to protect the interests of a child" in any proceeding involving allegations of abuse, neglect, or dependency. R.C. 2151.281 requires the same. Thus, the role of the guardian ad litem is to protect the child's interests and to provide the court with a recommendation regarding what is best for the child.

{¶ 64} In this case, the guardian ad litem recommended that the juvenile court deny the agency's motion for permanent custody and grant legal custody to father with protective supervision to the agency. The guardian ad litem informed the court that father and A.H. had a strong bond and that father had adequate housing, bedding, food, and supplies for A.H. Additionally, father received social security income and food stamps. And although father did not have a refrigerator or stove, he could cook food for A.H. on a hot plate. Moreover, the guardian ad litem

reported that the only reason father was not eligible for these appliances was because the agency was seeking permanent custody of A.H. Regarding father's mental health, the guardian ad litem reported that father continues to be engaged in services from FrontLine and receives an injection of his required medication every three months.

{¶ 65} The social worker assigned to the case testified that the agency was seeking permanent custody from the outset rather than temporary custody in part due to father's repeated hospitalizations and "pattern of incarceration." While it is true that father was admitted to the hospital after missing his medication in August 2023 and spent 15 days in jail for assaulting another resident while he was in the hospital, father had not been hospitalized or incarcerated due to his schizoaffective disorder since 2018 (hospitalized) and 2019 (he was released from jail in February 2019 after spending 180 days there for attempted vandalism).

{¶ 66} But beyond the 2018 and 2023 incidents, neither the FrontLine workers nor the agency's social worker testified to any other time where father had to be hospitalized or spend time in jail for mental-health reasons. While the FrontLine records do indicate that father had a history of hospitalization and incarceration, those times occurred many years before this case and even before the 2018 incident. The records also seem to indicate that father spent more time in a hospital or jail when he was taking pills — and therefore was not as compliant — instead of the longer-lasting injections of his medication, which he has most recently been receiving. Based on the evidence presented at trial, we do not agree with

CCDCFS that these incidents amount to a "pattern of incarceration" or hospitalization.

{¶ 67} We also find it significant that the Frontline employees who worked directly with father, treated his mental illness, and provided services to him did not testify that father's mental illness was so severe that he could not care for his son. In fact, father's peer support representative testified that he believed father could care for his son. A FrontLine supervisor who had worked with father for approximately six years testified that she was confident in father's ability to ask for the resources he needed and to follow through with obtaining those resources. And father's case manager testified that in the two-and-a-half years that she had worked with father, besides the incident in August 2023, father had not shown signs of psychosis and did not pose a safety concern — even when he missed his medication or was late receiving his injection.

{¶ 68} The social worker testified that the agency's main reason for requesting permanent custody rather than temporary custody was because FrontLine did not have a "set plan" to prevent father from missing his medication in the future. But they all agreed that father came to FrontLine in August 2023 to receive an injection of his medication and the only reason he did not receive it was because of insurance reasons. FrontLine workers testified that they could possibly give father his medication in pill form if they had to wait for insurance approval in the future, but there was no set plan. However, father had been compliant with his medication in the eight months since the incident occurred. And although it took a

couple of months after receiving his medication in September 2023 before father was completely symptom free, a nurse practitioner testified that father did not have overt signs of psychosis during those two months, and he was "under behavioral control," cooperative, and demonstrated insight into his diagnosis and symptoms.

{¶ 69} CCDCFS acknowledges that not every missed injection results in father having a mental-health crisis, but argues that the FrontLine records document other examples of problematic behavior. CCDCFS states that this problematic behavior occurs "sometimes even when [father] is fully medicated." For example, CCDCFS cites to one page of FrontLine's records where father was "very disoriented and acting menacing" and was "making odd noises between [his] teeth." It cites to another example where father was "rude and disrespectful" and "verbally aggressive and demanding." In one of the other entries in the Frontline records that CCDCFS points to, father "maintained inappropriate level of eye contact, staring unblinking at [the FrontLine worker]" and "enter[ed] into [the FrontLine worker's] personal space." There are more examples that CCDCFS cites from the FrontLine records where father's behavior is troublesome; however, these examples do not establish that father cannot care for his A.H.

{¶ 70} CCDCFS further argues that father's mental health makes it difficult for father to meet his own basic needs, let alone his child's needs. CCDCFS claims that father "relies on his case managers and peer support representative at FrontLine for assistance with housing, clothing, general supplies, and transportation." CCDCFS spent time during the dispositional hearing having the

FrontLine witnesses identify page after page in their records where father reached out for assistance and services. We disagree with CCDCFS, however, that this means that father cannot care for himself or A.H. Indeed, we agree with the juvenile court that father asking his case manager and peer support representative for help when he needs food, transportation, diapers, and other items shows that father is capable of caring for himself and A.H. Parents unable or failing to seek the help and resources they need is more problematic than the situation here.

{¶ 71} After reviewing the evidence in this case, we cannot say that the juvenile court's judgment was against the manifest weight of the evidence when it found that father's mental illness was not so severe that it made him "unable to provide an adequate permanent home for the child at the [time of the hearing] and, as anticipated, within one year after" the hearing. R.C. 2151.414(E)(2).

## 2. R.C. 2151.414(E)(1) — Failure to Remedy Conditions

{¶ 72} CCDCFS also argues that the juvenile court's judgment finding that father substantially remedied the conditions causing the child to be removed from the home was against the manifest weight of the evidence. Again, we disagree.

{¶ 73} CCDCFS claims that father had difficulty maintaining stable and appropriate housing. The social worker testified that father had lived in three separate places since this case has started. But the social worker agreed that father lost the first apartment because the landlord had failed to properly maintain it. The second place that father lived was only temporary until he could be approved for CMHA housing. And the third place, which was where he lived at the time of the

dispositional hearing, was a three-bedroom apartment that he had obtained through CMHA.

{¶ 74} CCDCFS argues that father's current apartment is not appropriate because it lacks a refrigerator and oven. While we agree this is problematic, it appears from the testimony at the hearing that father will be able to easily obtain these appliances once the agency is no longer seeking permanent custody. Moreover, the guardian ad litem testified that father had appropriate food available for A.H. and could heat it on a hot plate.

{¶ 75} CCDCFS contends that father also has a substance abuse issue. From the testimony of the FrontLine workers, father had consistently admitted to marijuana use. And some of the FrontLine workers documented times when father appeared to be under the influence of something. But no FrontLine worker or agency employee testified that father was using marijuana or under the influence while taking care of A.H.

{¶ 76} After review, we conclude that the juvenile court's decision finding that father had substantially remedied the conditions that caused the child to be removed was not against the manifest weight of the evidence.

### 3. R.C. 2151.414(E)(11) — Parental Rights Previously Terminated

{¶ 77} CCDCFS further argues that father had his parental rights terminated in February 2015 with respect to another child. CCDCFS maintains that because this factor applies, "'the burden is then on the parent to provide clear and convincing evidence to prove that, notwithstanding the prior termination, he or she can provide

a legally secure permanent placement and adequate care for the health, welfare, and safety of the child.'" CCDCFS's Brief at 24, quoting *In re M.J.*, 2013-Ohio-5440, ¶ 31. CCDCFS maintains that father did not prove that he could provide a legally secure placement for A.H. We disagree.

{¶ 78} Father competently cross-examined the agency's witnesses and presented the testimony of his peer support representative, establishing by clear and convincing evidence that he could provide a legally secure placement for A.H. and adequately care for him. Moreover, the evidence established that in the 2015 case, father did not complete the requirements of his case plan. And although father's case plan had not yet been adopted and ordered by the court in the present case, father established that he had remedied the conditions that led to A.H.'s removal, namely, that he had received appropriate medical care and had remained engaged in mental-health treatment and medication management. We therefore find no merit to the agency's argument that father did not establish that he could provide a legally secure placement for A.H. and adequately care for him.

## C. Best-Interest Factors

{¶ 79} The second requirement that a juvenile court must find before it can commit a child to the permanent custody of a public children services agency when the agency requests it as the disposition in its original complaint is that "permanent commitment is in the best interest of the child." R.C. 2151.353(A)(4). CCDCFS argues that the juvenile court's judgment finding that it was in A.H.'s best interest to grant legal custody to father was against the manifest weight of the evidence.

{¶ 80} In making the best-interest determination, the juvenile court should consider "all relevant factors," including, but not limited to (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents, and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody; and (5) whether any of the factors set forth in R.C. 2151.414(E)(7) to (11) apply. R.C. 2151.414(D)(1)(a)-(e).

{¶ 81} CCDCFS contends that the first and fourth best-interest factors support its argument that it was not in A.H.'s best interests for father to have legal custody of him.

{¶ 82} Regarding the first best-interest factor, the child's relationships to those who significantly affect the child, we disagree with CCDCFS that this factor weighs in favor of permanent custody. CCDCFS maintains that although A.H. is comfortable and excited to see father, he is also bonded to his foster mother. CCDCFS claims that A.H. "is generally content wherever his is." While we agree that it is good that A.H. is comfortable with his foster mother and the children in his foster home, we cannot agree with CCDCFS that this means that it is in A.H.'s best interests to be in the agency's permanent custody. At the time of the second hearing

in this case, A.H. had just turned three years old and his connection and bond to his father was just as strong — if not stronger — than it was to his foster family.

{¶ 83} CCDCFS further argues that A.H. has no connection to his extended biological family because father does not have any family members who live nearby. CCDCFS asserts that this is an issue because A.H. would have nowhere to go if father is incarcerated or hospitalized in the future. We disagree, however, that a lack of extended family in the area requires a juvenile court to find that permanent custody is in the best interest of a child.

{¶ 84} Regarding the fourth best-interest factor, the child's need for a legally secure permanent placement, CCDCFS argues that evidence presented at the hearing established that permanent custody was the only way for the child to achieve permanency. CCDCFS claims that permanent custody is the only way to achieve permanency because (1) father was "unable to maintain a consistent visitation schedule of once a week for two hours," (2) father's mental-health issues prevent him from providing appropriate care for A.H., (3) father failed to demonstrate that he has resolved the issues that resulted in a prior termination of parental rights, and (4) father has failed to remedy the conditions that caused the removal of A.H.

{¶ 85} We disagree with CCDCFS that these reasons support a finding that it was in A.H.'s best interest for the juvenile court to grant permanent custody to the agency. We have thoroughly addressed most of these arguments in the previous section (except visitation) for the purpose of determining whether A.H. could be returned to father within a reasonable time and rejected them. We likewise

conclude that these reasons do not support CCDCFS's argument that legal custody to father was not in A.H.'s best interests.

{¶ 86} Regarding visitation, the evidence at the hearing established that father had consistently visited A.H. since November or December 2023. The social worker testified that father missed four visits and that he sometimes ends the visits early. But she also testified that other than the four missed visits, father had been visiting A.H. weekly, that the visits go well, and father is appropriate with A.H. If anything, this evidence weighs in favor of granting legal custody to father.

{¶ 87} With respect to the remaining best-interest factors, CCDCFS acknowledges that they either support granting legal custody to father (the guardian ad litem's recommendation) or do not weigh in favor of either father or CCDCFS (the child had not been in the agency's custody for 12 or more months of a consecutive 22-month period but he had briefly been in the agency's custody for one of the cases that had been dismissed, and no (E)(7) to (E)(11) factors are present).

{¶ 88} After reviewing the evidence presented at the hearing, the juvenile court's decision finding that it was in A.H.'s best interests to be placed in his father's custody with protective supervision to CCDCFS was not against the manifest weight of the evidence.

### D. Temporary Custody

{¶ 89} CCDCFS argues that if the juvenile court did not believe that permanent custody was in A.H.'s best interests, it should have committed him to the temporary custody of CCDCFS. CCDCFS maintains that "a disposition of temporary

custody rather than legal custody to [father] would ensure the safety of A.H. while giving [father] the opportunity to demonstrate whether [he] can resolve the issues that lead to the removal of A.H. and provide him a safe and permanent home."

{¶ 90} We disagree with CCDCFS that the juvenile court "should have" granted temporary custody to the agency. While it certainly could have granted temporary custody to the agency, it was not required to do so. Notably, CCDCFS spent a significant amount of time during the dispositional hearing arguing against temporary custody. Moreover, while the juvenile court granted legal custody of A.H. to father, it awarded CCDCFS protective supervision. With protective supervision, CCDCFS can accomplish its objectives through a detailed case plan, including immediately assisting father with obtaining an oven and refrigerator.

{¶ 91} CCDCFS's first assignment of error is overruled.

### E. Evidentiary Issues

{¶ 92} In its second assignment of error, CCDCFS argues that the juvenile court erred when it excluded relevant information regarding father's long-standing mental-health issues — evidence that CCDCFS claims establishes that father's mental health makes it "difficult for him to appropriately parent a child."

{¶ 93} "'[T]he trial court has broad discretion in the admission . . . of evidence and unless it has clearly abused its discretion and the defendant has been materially prejudiced thereby, this court should be slow to interfere.'" *State v. Maurer*, 15 Ohio St.3d 239, 265 (1984), quoting *State v. Hymore*, 9 Ohio St.2d 122, 128 (1967). An abuse of discretion "'implies not merely error of judgment, but perversity of will,

passion, prejudice, partiality, or moral delinquency.'" *TWISM Enters., L.L.C. v. State Bd. of Registration for Professional Engineers & Surveyors*, 2022-Ohio-4677, ¶ 3, quoting *State ex rel. Commercial Lovelace Motor Freight, Inc. v. Lancaster*, 22 Ohio St.3d 191, 193 (1986). An abuse of discretion also "implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 94} CCDCFS acknowledges that the juvenile court admitted all 2,000 pages of the FrontLine records into evidence. But it contends that it is not clear from the record whether the juvenile court considered all the records or limited its decision to only those records dated April 2021, when the child was born, and later.

{¶ 95} First, we note that the juvenile court overruled father's objections and permitted CCDCFS's witnesses to testify to a significant amount of father's mental-health and substance-abuse history that the FrontLine workers had documented and occurred well before A.H. was born. For example, the juvenile court permitted CCDCFS to question witnesses about an entry from 2015 in the FrontLine records when father appeared to be intoxicated, an entry from 2016 when father said he smokes marijuana daily, an entry from 2018 when father agreed that using K2, a synthetic marijuana, was bad for him, an entry from 2018 when father lost his housing due to his schizoaffective disorder, an entry from 2019 when father was yelling at JFS workers because it was taking too long to file for food stamps, and many other entries as well.

{¶ 96} The juvenile court eventually told CCDCFS to limit its questioning to entries and events that occurred after the child was born. Because the hearing took place when the child was three years old, however, CCDCFS was still able to question witnesses about three years of father's more recent history.

{¶ 97} CCDCFS points to entries in the FrontLine records from five case managers who it did not call to testify but who "documented problematic behaviors exhibited by [father] over the years" and maintains that these records establish that father's mental health makes it difficult for him "to appropriately parent a child." We will review CCDCFS's proffered evidence regarding what these five case managers documented. CCDCFS states:

> Tanya Dissel documented that on one occasion, [father] followed her around the Frontline office, and that he "was very disoriented and . . . menacing" and that on another occasion he was both "rude and disrespectful" and "verbally aggressive and demanding". (Exhibit 1 at 1010, 1164). Christopher Davis documented an incident where [father], who was in dirty clothing and not well-groomed, "maintained inappropriate levels of eye contact, staring unblinking at [Mr. Davis] and entering into [Mr. Davis]'s personal space". (Exhibit 1 at 1034). Mr. Davis documented other incidents including one where [father] threatened physical violence; another where [father] was "erratic and very angered" and pounded on Mr. Davis's door; and a third where [father] banged on Mr. Davis's window, shouted demands through the window, changed his clothes in the vestibule of Frontline's office building, and ran out into the street "with no mind to traffic at all". (Exhibit 1 at 1052, 1123, 1273). Haley Alkire documented an incident where [father] appeared at Frontline without shoes, so she accompanied him to the Northeast Ohio Coalition for the Homeless (NEOCH). (Exhibit 1 at 1350). While at NEOCH, he became aggressive and cursed at the staff, upsetting them. (*Id.*). Maryanne Sayle entered a note detailing a conversation with [father] where he discussed pending criminal charges related to an incident on the RTA. (Exhibit 1 at 1410). Michelle Campbell described an incident where [father] "was very agitated, swearing, [and] disrespectful". (Exhibit 1 at 1452).

{¶ 98} While we agree these behaviors, which occurred from 2018 to 2020, are problematic, we do not agree they establish that father cannot adequately care and provide for A.H., especially considering the totality of the evidence presented at the hearing — evidence presented from CCDCFS's own witnesses as well as father's and involved more recent events than the proffered evidence. The more recent evidence established that there were many times when father was appropriate at FrontLine, did not show any overt signs of psychosis (even sometimes when he missed his medication or was late taking it), showed insight into his diagnosis, and was cooperative with the workers.

{¶ 99} After review, we cannot say that the juvenile court abused its discretion when it limited some of CCDCFS's questioning to more recent events. And even if we were to agree with CCDCFS that the juvenile court should not have prevented the agency from presenting this evidence, we do not agree that it would have affected the outcome of the hearing. Thus, any error on the part of the juvenile court, if there was any, was harmless.

{¶ 100} CCDCFS's second assignment of error is overruled.

{¶ 101} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MICHELLE J. SHEEHAN, PRESIDING JUDGE

MARY J. BOYLE, J., and
MICHAEL JOHN RYAN, J., CONCUR