[Cite as *In re Ar.M.*, 2025-Ohio-751.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE AR.M., ET AL.                  :

Minor Children                       :          No. 114335

                                     :

[Appeal by Mother, M.S.]             :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** March 6, 2025

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD24903393 and AD24903394

---

### *Appearances:*

Rosel C. Hurley III, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Joseph C. Young, Assistant Prosecuting Attorney, *for appellee.*

LISA B. FORBES, J.:

{¶ 1} M.S. ("Mother") appeals the juvenile court's decision terminating her parental rights and awarding permanent custody of her twin children, Ar.M. and Ah.M. ("the Children"), to the Cuyahoga County Division of Children and Family Services ("CCDCFS" or "the Agency"). After reviewing the facts of the case and pertinent law, we affirm the juvenile court's decision.

## I. Procedural History and Factual Background

### A. Prior History

{¶ 2} On October 8, 2020, CCDCFS filed a complaint alleging that the Children were abused. On January 5, 2021, the juvenile court adjudicated the Children to be abused, finding they suffered injuries consistent with physical abuse for which the parents were unable to provide a reasonable explanation. The juvenile court committed the Children to the temporary custody of CCDCFS.

{¶ 3} The Children remained in the Agency's care with relative or foster caregivers until March 23, 2023. On March 24, 2023, the Children were returned to Mother under protective supervision, which was eventually terminated for Ah.M., but continued for Ar.M.

### B. This Case

{¶ 4} On April 4, 2024, CCDCFS filed a complaint alleging the Children were abused and neglected and requesting a dispositional order of permanent custody to CCDCFS. The juvenile court held a hearing the same day and granted predispositional custody to CCDCFS.

{¶ 5} On July 2, 2024, the juvenile court held an adjudicatory hearing. Both Mother and A.M. ("Father") were present and represented by counsel. Both Mother and Father stipulated to the allegations in the amended complaint, including that "[c]hildren were previously adjudicated Abused due to suffering injuries consistent with physical abuse"; "Ar.M. has sever [sic] special needs"; "the children were found with inappropriate caregivers. Mother has pending charges of

endangering children"; and "Mother needs to maintain appropriate housing." The trial court found the Children were neglected.

{¶ 6} The juvenile court held a dispositional hearing on August 15, 2024, at which the court heard testimony and admitted exhibits. Both Mother and Father were present and represented by counsel. The juvenile court filed journal entries on August 19, 2024, ordering the Children to be placed in permanent custody of CCDCFS and terminating the parental rights of Mother, Father, and any John Doe alleged father.

{¶ 7} From this order, Mother appeals[1] raising the following assignment of error:

> The trial court erred in awarding permanent custody to CCDCFS as appellee failed to show by clear and convincing evidence that adequate grounds existed for a grant of permanent custody and therefore such decision was contrary to the manifest weight of the evidence.

## C. Hearing Testimony

{¶ 8} The following testimony was presented at the August 15, 2024 hearing on CCDCFS's complaint for permanent custody. In addition, the parties stipulated to the admission of documentary evidence including medical records, court journal entries regarding the prior case involving the Children, and journal entries related to the criminal charges pending against Mother at the time of the hearing. The court also admitted into evidence photographs of Ar.M.

---

[1] Father also appealed the juvenile court's decision in consolidated companion cases *In Re A.M.,* 8th Dist. Cuyahoga Nos. 114380 and 114381.

### 1. Lauren Hopkins

{¶ 9} Lauren Hopkins ("Hopkins") testified that she was employed by CCDCFS as a child-protection specialist. CCDCFS assigned Hopkins to the cases of the Children from June, 2022, to April, 2024.

{¶ 10} Hopkins testified that M.S. is the Children's mother and A.M. is their alleged father, because paternity had not been established as of the dispositional hearing.

{¶ 11} Hopkins testified that, when she was assigned to the Children, CCDCFS developed a case plan for the parents. The plan concerned issues of parenting, housing, and domestic violence. Hopkins testified these issues had not been resolved at the time she transferred the case to another child-protection specialist.

{¶ 12} Hopkins testified that Ar.M. had significant medical conditions and needs, including blindness, cerebral palsy, immobility, and feeding through a "G-Tube." Ar.M.'s medical needs required specialized care, for which Mother received training.

{¶ 13} Hopkins further stated that Ar.M.'s conditions require frequent medical appointments, which Mother began to miss at the beginning of 2024. Mother was referred to a medical case-management worker, who attempted to assist her in making appointments and maintaining an appointment schedule. Hopkins reported that Mother was initially engaged with the medical case-management worker, but that she later became disengaged. Likewise, Mother became disengaged

with Hopkins. Mother missed or rescheduled appointments. Once, Mother "forgot" to have the Children present for a scheduled home visit by Hopkins. That time, Hopkins saw the Children by going to maternal great-grandmother's house. Hopkins explained that CCDCFS was concerned with maternal great-grandmother's ability to care for the Children because she "has dementia." No other adults lived with great-grandmother, but at times Mother's brother stayed there. Hopkins believed Mother's brother was 14 years old.

{¶ 14} Hopkins stated that Mother stopped replying to her messages in April 2024, and that she believed Mother missed an appointment. At this time, Hopkins did not know where the Children were located. Hopkins explained that in the beginning of April 2024, she arrived at the home where Mother lived with her mother and stepfather, along with the Children. The stepfather informed Hopkins that Mother was "no longer staying there." Mother did not inform Hopkins of where she was living and did not make Hopkins aware of where Ar.M. was living. At that time, Ar.M. was under protective supervision.

{¶ 15} When Hopkins was not able to reach Mother and did not know where the Children were, she reached out to Father who informed her that he thought the Children were at great-grandmother's home with Mother's minor brother. With the help of police, Hopkins and another CCDCFS worker entered the home. Hopkins described what she saw when she entered the home. It "was very dirty" and "had a very bad smell. And Ar.M. was in his car seat, and at first we thought it was throw-up that was all over his head and all over his car seat, and he just did not look okay.

And Ah.M. was running around the house." Hopkins testified that Mother's 14-year-old brother was "supposedly in charge" of the Children.

{¶ 16} The police called EMS, and both Children were taken to the hospital by ambulance. At the hospital, it was discovered that the substance all over Ar.M. was feces. Ah.M. was found to be dehydrated but was released from the hospital. Ar.M. was admitted to the pediatric intensive care unit because he was severely underweight. He remained hospitalized for two weeks.

{¶ 17} Hopkins stated that the Children were released to a nonrelative-foster home in which they had previously lived while in temporary custody. Under the care of his foster parents, Ar.M. regained weight and attended follow-up medical appointments.

{¶ 18} On cross-examination, Hopkins explained that, after the complaint for permanent custody was filed in this case, she did not make any new referrals for services for Mother, because CCDCFS did not initially know where Mother was. Eventually, Mother's location in jail was known.

### 2. Keshia Turner

{¶ 19} Keshia Turner testified that she is employed by CCDCFS as a child-protection specialist. She was assigned to the Children in April 2024, after the Children were placed in the emergency custody of CCDCFS. Turner was aware that a case plan had previously been developed, before she was assigned to this case. The Agency's concerns included parenting, housing, and medical care for the Children. According to Turner, there was "an ongoing concern of [Mother's] ability to provide

basic needs for the children and/or address their medical needs consistently." According to Turner, there was also a concern that Mother may have mental-health issues "in regards to not addressing the medical needs of [Ar.M] and leaving both of the children in the care of an inappropriate caregiver." Turner clarified that she could not diagnose whether Mother, in fact, had a mental-health condition.

{¶ 20} Turner testified that, at the time of trial, Mother had been arrested and jailed on charges related to domestic violence and child endangering, with Ar.M. and Ah.M. identified as victims.

{¶ 21} Although Turner was not able to make services available for Mother, she did communicate with the jail liaison to inquire about services. The jail liaison explained that certain mental-health services are available on a first-come, first-served basis in the jail. However, according to Turner, there was no way for the Agency to provide other services for Mother while incarcerated.

{¶ 22} Turner testified that she spoke to Father about relatives that might be able to take custody of the Children. None were identified. Turner explained that alleged Father "does not have stable or appropriate housing for the children, . . . and he has not been engaged in any of the services that [were] offered to him."

{¶ 23} Turner observed the Children with foster parents and during supervised visitation with Father. Turner testified that she observed a bond between Ah.M. and his foster parents. She stated, "I would say he's attached to the foster mom." Turner further stated, "[W]hen [foster mom] leaves the room, he'll start

crying and . . . he's just hugging on foster mom." Regarding Father, Turner testified, "I really haven't observed for them to have a bond."

### 3. Guardian Ad Litem

{¶ 24} The Court reviewed a report provided by the Children's guardian ad litem ("GAL"). The report, filed on August 12, 2024, indicated that the GAL conducted or attempted to conduct interviews with the Children, Mother, Father, extended family members, associates of the parents, law enforcement, caseworkers, and legal counsel to the case parties. The GAL also conducted or attempted to conduct home visitations and observations. The report stated that the Children were found with inappropriate caregivers, that Ar.M. lost significant body weight and was hospitalized, and that the Children's foster parents are able to meet their basic and specialized needs.

{¶ 25} At the dispositional hearing, the GAL testified that, in her opinion, Mother and Father did not have the capacity to provide secure placement for the Children. She noted that the Children are four years old and have been in the Agency's custody for over half of their lives. Of particular concern to the GAL was that Mother had been charged with child endangerment related to the Children and that "the boys were in such bad condition when located by Children Services in late April." She pointed out that, when they were found, the Children were dirty and "[t]he house was deplorable." In addition, Ar.M. was not being fed. Based on her review of the case, the GAL recommended the Children be committed to the permanent custody of CCDCFS.

## II. Law and Analysis

### A. Standard of Review — Permanent Custody

{¶ 26} Following an agency request for permanent custody as part of its original abuse and neglect complaint, courts use a two-part test articulated in R.C. 2151.353(A)(4) to determine whether to grant an agency permanent custody of a child. *In re A.H.*, 2024-Ohio-5485, ¶ 55 (8th Dist.). R.C. 2151.353(A)(4) provides that "[i]f a child is adjudicated an abused, neglected, or dependent child," the court may "[c]ommit the child to the permanent custody of a public children services agency" if the court (1) "determines in accordance with division (E) of section 2151.414 of the Revised Code that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent"; and (2) "determines in accordance with division (D)(1) of section 2151.414 of the Revised Code that the permanent commitment is in the best interest of the child."

{¶ 27} "An appellate court will not reverse a juvenile court's termination of parental rights and award of permanent custody to an agency if the judgment is supported by clear and convincing evidence." *In re M.J.*, 2013-Ohio-5440, ¶ 24 (8th Dist.). The Ohio Supreme Court recently clarified that, when reviewing a juvenile court's award of permanent custody and termination of parental rights, "the proper appellate standards of review to apply . . . are the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards, as appropriate depending on the nature of the arguments that are presented by the parties" rather than an abuse-of-discretion standard. *In re Z.C.*, 2023-Ohio-4703, ¶ 18. Regarding whether a juvenile

court has sufficient evidence to satisfy the clear-and-convincing-evidence standard in R.C. 2151.414(E), Ohio Supreme Court has stated:

> "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established."

*In re Z.C.* at ¶ 7, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶ 28} "When applying a sufficiency-of-the-evidence standard, a court of appeals should affirm a trial court when 'the evidence is legally sufficient to support the jury verdict as a matter of law.'" *In re Z.C.* at ¶ 13, quoting *Bryan-Wollman v. Domonko*, 2007-Ohio-4918, ¶ 3. A trial court's judgment may be sustained by sufficient evidence, but an "'appellate court may nevertheless conclude that the judgment is against the manifest weight of the evidence.'" *Id.* at ¶ 14, quoting *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 12. In reviewing a juvenile court's decision regarding permanent custody on weight-of-the-evidence grounds,

> the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.

*In re Z.C.* at *id.*, citing *Eastley*.

{¶ 29} We find the record contained clear and convincing evidence to support granting CCDCFS permanent custody of the Children and M.S. has not

demonstrated that the court's decision was against the manifest weight of the evidence.

**B. R.C. 2151.414(E) Factors**

{¶ 30} As noted, to award an agency permanent custody of a child pursuant to R.C. 2151.353(A)(4), a juvenile court must find that at least one factor enumerated in R.C. 2151.414(E) exists. Pursuant to R.C. 2151.414(E), "[i]f the court determines, by clear and convincing evidence . . . that one or more of the [the enumerated] factors exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent[.]"

{¶ 31} With respect to each child, the juvenile court found "the child cannot be placed with one of the child's parents within a reasonable time and should not be placed with either parent." The court found that several of the statutory factors exist regarding Mother, including R.C. 2151.414(E)(1) and (4). The court stated, "[T]he parents have failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the home; the parents have demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so." The court also found "mother is incarcerated at the time of the filing of the dispositional hearing of the child and is not available to care for the child."

{¶ 32} Regarding R.C. 2151.414(E)(1), there was clear and convincing evidence that Mother failed to remedy the problems that initially caused the

Children to be placed in the Agency's custody. In 2021, the Children were adjudicated to be abused after suffering injuries while under their parents' care. Ar.M.'s resulting medical conditions included blindness, cerebral palsy, and immobility. He required hospitalization and feeding through a G-Tube. The parents were referred to case-plan services to address issues of parenting, housing, and domestic violence. In particular, Mother received repeated training to care for Ar.M.'s medical needs, including being connected with a medical case-management worker to assist Mother in making and keeping medical appointments for Ar.M.

{¶ 33} In April 2024, while Ar.M. was still under protective supervision, Mother ceased communicating with CCDCFS, and the Children's whereabouts were unknown. It was discovered that Mother left the Children with an inappropriate caregiver, their maternal great-grandmother, who suffers from dementia, and Mother's 14-year-old brother. When CCDCFS found the children, Ar.M. was covered in feces. He had lost significant weight and had to be hospitalized for two weeks, initially in pediatric intensive care, to stabilize his condition. There was no indication that either great-grandmother or the 14-year-old had training in how to care for Ar.M. Ah.M. was running around and very dirty. Clear and convincing evidence supported the court's finding under R.C. 2151.414(E)(1) that Mother failed to remedy the conditions that necessitated CCDCFS custody of the Children.

{¶ 34} Regarding R.C. 2151.414(E)(4), the record also included clear and convincing evidence that Mother demonstrated a lack of commitment toward the Children through her unwillingness to provide an adequate permanent home for the

Children. As noted, Ar.M. requires ongoing treatment for his medical needs, including routine appointments. Hopkins testified that Mother began missing appointments in 2024. Mother also became less engaged with CCDCFS, rescheduling several visits and failing to arrange for the Children to be present for another scheduled CCDCFS visit. That Mother left the Children in deplorable conditions, with their great-grandmother, who suffers from dementia, and their 14-year-old uncle further demonstrates Mother's lack of commitment to the Children. Moreover, Mother's incarceration at the time of the hearing meant she was unable to provide any type of home for the Children. The juvenile court's findings under R.C. 2151.414(E)(4) were supported by clear and convincing evidence.

## C. R.C. 2151.414(D)(1) Best-Interest Factors

{¶ 35} To award an agency permanent custody of a child, a juvenile court must find that "permanent custody is in the child's best interest." R.C. 2151.353(A)(4). R.C. 2151.414(D)(1) requires, in determining the best interests of the child, that juvenile courts

> consider all relevant factors, including, but not limited to: (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child; (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division

(D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state; (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 36} When analyzing the best interest of the child, "[t]here is not one element that is given greater weight than the others pursuant to the statute." *In re Schaefer*, 2006-Ohio-5513, ¶ 56. "This court has stated that only one of the enumerated factors needs to be resolved in favor of the award of permanent custody." *In re S.C.*, 2015-Ohio-2410, ¶ 30 (8th Dist.). "R.C. 2151.414(D)(1) does not require a juvenile court to expressly discuss each of the best interest factors in R.C. 2151.414(D)(1)(a) through (e). Consideration is all the statute requires." *In re A.M.*, 2020-Ohio-5102, ¶ 31.

{¶ 37} In its journal entry, the juvenile court expressly stated that it had considered the factors set forth in R.C. 2151.414(D). After review, we find that clear and convincing evidence in the record supports the trial court's determination that awarding the Agency permanent custody was in the Children's best interests.

{¶ 38} Regarding R.C. 2151.414(D)(1)(a), interaction and interrelationship with significant others, Turner testified that she had observed a bond between Ah.M. and his foster parents. She stated, "I would say he's attached to the foster mom." Turner further stated, "[W]hen [foster mom] leaves the room, he'll start crying and . . . he's just hugging on foster mom." Ar.M. has regained and maintained weight while in the care of his foster parents. Concerning the bond between the Children

and other caregivers, Ms. Hopkins testified that the Children's great-grandmother did not know their names. Regarding Father, Turner testified, "I really haven't observed for them to have a bond." This is clear and convincing evidence that the interaction and interrelationship of the Children with parents, foster parents, and other significant relatives weighed in favor of awarding the Agency permanent custody.

{¶ 39} The Children's wishes, which the court considered under R.C. 2151.414(D)(1)(b), weighed in favor of awarding permanent custody to the Agency. Juvenile courts "consider[] the GAL's recommendation on the permanent custody motion as part of the R.C. 2151.414(D)(1)(b) analysis where the children are too young to express their wishes." *In re R.A.*, 2021-Ohio-4126, ¶ 52 (8th Dist.). The Children were four years old at time of trial and were, per the guardian ad litem's testimony, too young to state their wishes regarding future custody. The guardian ad litem recommended awarding CCDCFS permanent custody. The court appropriately considered this clear and convincing evidence in support of permanent CCDCFS custody.

{¶ 40} The record also contained clear and convincing evidence that the custodial history and age of the Children weighs in favor of permanent CCDCFS custody. The Children were placed in the Agency's custody from July 2020 through March 2023. The Children were returned to the Agency's custody in April 2024. At four years old, the Children had been in CCDCFS custody for over half their lives.

This is clear and convincing evidence to support the award of permanent custody to CCDCFS under R.C. 2151.414(D)(1)(b).[2]

{¶ 41} There was also clear and convincing evidence for the court to weigh the Children's need for a legally secure placement under R.C. 2151.414(D)(1)(d) in favor of permanent custody. As discussed above, the court found, based on clear and convincing record evidence, that the Children "cannot be placed with one of the child's parents within a reasonable time and should not be placed with either parent." This finding precludes the court from considering returning the Children to their parents' custody. *In re T.S.*, 2024-Ohio-827 (8th Dist.). Maternal great-grandmother is not an adequate caregiver. Her supervision of the Children resulted in Ar.M.'s hospitalization. The Agency could not identify other potential appropriate relatives to serve as caregivers. The record included clear and convincing evidence

---

[2] In assessing best interests, R.C. 2151.414(D)(1)(b) instructs the court to consider custodial history, including but not limited to consideration of whether the child has been in "temporary custody of a public children services agency or private child placing agency under one or more separate orders of disposition for twelve or more months of a consecutive twenty-two-month period." Here, the trial court made a finding, apparently not in conjunction with the best-interest analysis that the Children had been in the temporary custody of CCDCFS under one or more separate orders of disposition for twelve or more months of a consecutive twenty-two month period. While that is true regarding the Children's overall custodial history, it is not true as it relates to the complaint for permanent custody presently before this court. On April 4, 2024, CCDCFS filed its complaint seeking permanent custody in this case. That same day, the Children were placed in the Agency's emergency-temporary custody. The Children were adjudicated neglected on July 2, 2024. The hearing on the request for permanent custody occurred on August 15, and the court issued its award of permanent custody on August 19, 2024. Thus, 12 months had not elapsed between the filing of the complaint and final disposition.

to support a finding that legally secure placement could not be achieved without a grant of permanent CCDCFS custody.

{¶ 42} The juvenile court properly considered the R.C. 2151.414(D)(1) factors before finding that awarding permanent custody to CCDCFS was in the Children's best interests. The record included clear and convincing evidence to support the court's findings.

{¶ 43} The juvenile court made the required findings under R.C. 2151.353(A)(4), in accordance with R.C. 2151.414(E) and 2151.414(D)(1), to award the Agency permanent custody. There was clear and convincing evidence in the record supporting the court's decision such that the decision was not against the manifest weight of the evidence. Appellant's sole assignment of error is overruled.

{¶ 44} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LISA B. FORBES, JUDGE

MICHELLE J. SHEEHAN, P.J., and
DEENA R. CALABRESE, J., CONCUR